**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 30, 2025

*Stephens, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 30, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| KERRY L. ERICKSON ET AL., | NO. 103135-1 |
| Petitioners, | EN BANC |
| v. | |
| PHARMACIA LLC, | Filed: <u>October 30, 2025</u> |
| Respondent. | |

STEPHENS, C.J.— Three public school teachers got sick after working in an old school building containing polychlorinated biphenyls (PCBs) made by Monsanto. They sued Monsanto's successor-in-interest, Pharmacia, and received a jury verdict for compensatory and punitive damages following an extensive trial with dozens of expert witnesses. The Court of Appeals reversed and remanded for a new trial, finding error in pretrial rulings regarding the applicable choice of law. Specifically, it found that the trial court erred by applying the Washington product liability act (WPLA), ch. 7.72 RCW, to assess Pharmacia's liability while at the same time applying Missouri's law on repose rather than the WPLA's repose provision. It affirmed the application of Missouri law to punitive damages but held

that the trial court erred in using a verdict form that did not limit damages to claims recognized under Missouri law. The court also found error in the trial court's admission of certain expert testimony.

We granted review and now partially reverse the Court of Appeals. We conclude that the Court of Appeals erred by failing to apply the choice of law principles established over 50 years ago in *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 555 P.2d 997 (1976). Where the laws of interested states conflict—including between the WPLA and Missouri common law—we apply the law of the state with the most significant relationship to that issue. Applying those principles here, we hold that Missouri has the most significant relationship to the issues of repose and punitive damages and therefore Missouri law governs both. We also hold that the jury was not required to identify the specific theories of liability recognized by Missouri law that supported an award of punitive damages, and that the jury instructions and the special verdict form are sufficient to sustain the punitive damages award. Finally, we hold that the expert testimony of industrial hygienist Kevin Coghlan, which estimated the historic levels of PCBs present at the time the teachers worked at the school, was based on generally accepted methodology that satisfies the standards for admissibility under *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), and ER 702.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Relevant facts are drawn from the trial record and the briefing. We begin with a general overview of PCBs and their use in school buildings and then describe how this product liability lawsuit originated and progressed through the trial court and the Court of Appeals, framing the issues now before us for review.

*History of PCBs, Monsanto, and Pharmacia LLC*

In 1929, the Swann Chemical Company invented a family of chemicals called polychlorinated biphenyls, commonly known as PCBs. Considered groundbreaking at the time, PCBs enhanced flexibility and durability in products like caulks and paints, and their resistance to burning and good insulating properties made them ideal for use as coolants and lubricants in transformers, capacitors, and other electrical equipment. PCBs quickly became an industry standard for electrical companies such as General Electric.

In 1935, Monsanto Company, based in St. Louis, Missouri, purchased Swann Chemical Company and began making and selling PCBs. Monsanto manufactured PCBs at two production facilities, one in Alabama and the other in Illinois. Its primary corporate business operations, including sales, marketing, public relations, and advertising, were based at its headquarters in St. Louis. The company's medical department, which was responsible for overseeing research into the potential hazards of PCBs, was also located in St. Louis.

Scientists, including those at Monsanto, gradually began to discover the harmful effects of PCBs. Toxicological testing conducted by Monsanto as early as the 1930s confirmed that exposure to PCBs, whether through vapors or skin contact, posed risks of systemic toxic effects. In 1966, Swedish scientists learned that PCBs remain in the environment and cause harm to fish and wildlife. In 1970, Monsanto began phasing out the sale of PCBs for use in certain applications. By 1972, the company restricted its PCB sales to use in electrical fluids, and by 1977, it ceased PCB production entirely. In 1979, the U.S. Environmental Protection Agency (EPA) officially banned the manufacture, processing, and sale of PCBs in the United States after identifying their severe toxic effects on humans and wildlife. *See* Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, 40 CFR Part 761; *Env't Def. Fund, Inc. v. Env't Prot. Agency*, 205 U.S. App. D.C. 139, 636 F.2d 1267, 1270 (1980).

Through a series of transactions in the late 1990s, Monsanto reorganized into three separation corporations, each responsible for a different industry. The entity now known as Monsanto Company manages the agricultural products business, and Solutia Inc. assumed its chemical products business. Pharmacia retained the pharmaceutical business and is the successor-in-interest to the original Monsanto Company.

*Sky Valley Education Center*

The school buildings at issue in this case were built between 1967 and 1968, during a time when PCBs were commonly used in caulking and light ballasts. Over the following 50 years, the Monroe School District (MSD) used the buildings as a high school, junior high school, middle school, and since 2011, as the home of the K-12 Sky Valley Education Center (SVEC). During the 1990s and the early 2000s, the EPA and other public health organizations distributed information to school districts, warning about the presence of PCBs in light ballasts. By 2000, MSD was aware that many of the light fixtures in the Monroe middle school buildings contained PCBs, that PCBs posed a hazard to people in the buildings, and that special care was required to remove light ballasts to avoid risks from exposure. In 2007, MSD received a report that the school's deterioration was worse than any other school within the district and that the buildings were in critical need of renovation. Despite this, when the middle school relocated to a new building in 2011, MSD moved SVEC into the old buildings.

Teachers and students at SVEC began reporting a range of health concerns, including headaches, rashes, fatigue, blurred vision, and memory, sinus, and respiratory issues. The teachers reported that their symptoms seemed to improve when they spent time away from the school buildings yet returned upon reentering them. Starting in 2014, the school began a two-year project to clean and repair light

fixtures, replace light ballasts, remove carpet, and improve ventilation.  There was no effort to measure PCBs at SVEC until 2016, after remediation efforts began and PCB-containing light ballasts were removed. Upon finding that PCB levels exceeded federal limits, the EPA, along with state and local agencies, worked with MSD on a PCB remediation and monitoring plan.

*Procedural History*

In May 2018, several SVEC teachers and students filed suit against all three of Monsanto's successor corporations, MSD, Union High School District, and Snohomish Health District, alleging injuries from PCB exposure.  The plaintiffs in this case include three former teachers, Kerry Erickson, Michelle Leahy, and Joyce Marquardt, who taught at SVEC in the old middle school buildings between 2011 and 2016, and retired as a result of their declining health.  The plaintiffs filed claims against Pharmacia under the WPLA for design defect, construction defect, failure to warn at the time of sale, and failure to warn postsale.[1]  They also sought punitive damages under Missouri law.

By the time of trial in June 2021, Pharmacia was the sole remaining defendant in this case.  Since the filing of this lawsuit, over 250 SVEC teachers, students, and

---

[1] The lawsuit also includes Leahy's husband, who claims loss of consortium.  The issues in this case do not depend on any distinction among the plaintiff-petitioners, and we refer to them collectively as Erickson or the plaintiffs.

family members have filed similar claims, resulting in 17 related lawsuits filed over 13 months. This is the first SVEC case against Pharmacia to reach our court.

The trial court ruled on 115 separate pretrial motions. As relevant here, Erickson moved to establish that under Washington's choice of law principles, Missouri law governs the issues of repose and punitive damages. Pharmacia moved to dismiss the complaint, arguing that Washington law applied and that the WPLA's statute of repose barred the plaintiffs' claims. The trial court applied Washington's choice of law rules and concluded that Missouri has a stronger interest in enforcing its repose and punitive damages laws, which are designed to deter tortious conduct, than Washington has in applying its laws to limit plaintiffs' recovery. As a result, the court ruled in favor of Erickson and concluded that Missouri law governs the issues of repose and punitive damages.

Pharmacia also moved under *Frye* and ER 702 to exclude testimony from industrial hygienist Kevin Coghlan, which Erickson proffered to show the teachers were likely exposed to injury-causing levels of PCBs during the time that they taught at SVEC. In 2019, Coghlan prepared a report estimating the historic levels of PCBs in the air at SVEC during the time the teachers worked there. His report used three methods of estimation: one based on an EPA-published study measuring the rate at which various building materials absorb PCBs from the air, and two based on a

separate EPA-published study about pre- and postremediation levels of PCBs in similar public schools in New York City.

Without holding an evidentiary hearing, the trial court initially granted Pharmacia's motion in part and excluded Coghlan's testimony aimed at estimating the air concentration of PCBs at SVEC. Later, the trial court granted Erickson's motion for reconsideration and admitted all the challenged evidence, still without holding an evidentiary hearing. The court explained that its initial ruling was based on a misunderstanding of Coghlan's methodology.

Trial began in June 2021 and lasted approximately seven weeks. Following two days of deliberations, the jury found for Erickson on all four WPLA claims. The jury awarded compensatory damages of $15 million to Erickson, $17 million to Marquardt, $18 million to Leahy, and $150,000 to Leahy's spouse for loss of consortium due to Leahy's injuries. Additionally, the jury awarded each teacher $45 million in punitive damages. The verdict form did not require the jury to specify which theory of liability supported punitive damages, though the instructions required a finding of complete indifference to or conscious disregard for the safety of others, consistent with Missouri law. Pharmacia challenged the verdict and moved for judgment as a matter of law, or, alternatively, for a new trial and for remittitur of the damage awards. The trial court denied these motions.

The Court of Appeals reversed in a split, published decision. *Erickson v. Pharmacia, LLC*, 31 Wn. App. 2d 100, 110-11, 548 P.3d 226, *review granted*, 3 Wn.3d 1018 (2024). The court separately analyzed choice of law for the issues of repose and punitive damages. For repose, the court disagreed with the trial court and held that Washington law applies. Rather than adhere to Washington's usual choice of law methodology, which follows an issue-by-issue approach, the court held that statutes of repose are "claim-defining" and cannot be separated from the underlying law of liability. *Id.* at 110. The court further rejected Erickson's constitutional challenge to the WPLA's statute of repose and remanded for the trial court to consider the claims under that presumptive 12-year repose period.

With respect to punitive damages, the Court of Appeals affirmed the trial court's holding that Missouri law applies to authorize such damages. However, notwithstanding its determination that Washington law supplies the substantive product liability standards, the court limited the availability of punitive damages to claims recognized under Missouri product liability law, which it held does not include a postsale failure to warn claim. Because the verdict form did not require the jury to specify a liability theory for punitive damages, the court remanded with the instruction to include a special interrogatory to that effect.

Concerning the admissibility of Coghlan's expert testimony, the Court of Appeals held that two of Coghlan's three methods for estimating the teachers' PCB

9

exposure should have been excluded under *Frye* and declined to address them under ER 702. The court held that Coghlan's third method—a direct comparison with the New York schools—did not implicate *Frye* and satisfied the requirements of ER 702.

Writing separately, Judge Dwyer joined the majority's holding that the WPLA's statute of repose is constitutional and reasoned that a contrary holding would likely invalidate the entire WPLA because the statute of repose is inseparable. Judge Dwyer dissented on the *Frye* issue, concluding that Pharmacia's challenges to Coghlan's scientific methodology concerned only the weight of the testimony rather than admissibility.

Erickson sought review on several issues: whether the WPLA's statute of repose applies, whether the statute of repose is constitutional, whether the punitive damages award is sustainable under Missouri law, and whether Coghlan's expert testimony satisfies the *Frye* standard and ER 702. Pharmacia opposed review and raised a conditional issue in the event of review: whether Missouri law applies to the issue of punitive damages. We granted review of all issues raised by both parties and accepted amici briefs.[2] We later asked the parties to supplement the record with

---

[2] We accepted amici briefs from (1) a group of six law professors (Symeon Symeonides et al.), (2) a single law professor (Kermit Roosevelt III), (3) a group of three law professors (Erin O'Hara O'Connor et al.), (4) a former Chief Justice of the Missouri Supreme Court and a law professor (Missouri law experts), (5) the Washington State Association for Justice Foundation, (6) former SVEC students and their families, (7) the Product Liability Advisory Council, and (8) the

relevant materials from a three-day *Frye* hearing conducted in a subsequent SVEC case, *Rose v. Pharmacia*, No. 18-2-58239-3 SEA (King County Super. Ct., Wash. Nov. 4, 2024) (hereinafter *Rose* Order), which addressed the admissibility of Coghlan's testimony based on methods essentially identical to those at issue here.

## ANALYSIS

We separate our analysis into two major sections.  We begin with choice of law, both the method of analysis and its application to the issues of repose and punitive damages. We then turn to the admissibility of Kevin Coghlan's expert testimony and whether his opinions should have been excluded under *Frye* or ER 702.

I.    Choice of Law

The primary dispute in this case centers on choice of law.  The parties agree that the WPLA governs the substantive elements of liability: duty, breach, causation, and compensatory damages.  However, they disagree on whether the WPLA also governs the availability of repose and punitive damages in claims brought under the WPLA.  Erickson contends that under Washington's choice of law principles, Missouri has the more significant interest in applying its laws on repose and punitive damages than Washington, and therefore Missouri law governs those discrete issues.

---

Duwamish River Community Coalition, Puget Soundkeeper, the Waste Action Project and BJ Cummings.

Pharmacia argues that the WPLA cannot be applied piecemeal, and that once the plaintiffs chose the WPLA as the law governing liability, its provisions must also govern repose and punitive damages. We review choice of law questions de novo. *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 691, 167 P.3d 1112 (2007). To provide context to the parties' arguments, we find it helpful to briefly review the history of Washington's approach to choice of law.

A. Washington applies the law of the state with the most significant relationship to each particular issue in a case

Choice of law rules are generally part of the common law, and courts have the same freedom to adopt or change these rules as with other areas of the common law. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 5 cmts. a, c (Am. L. Inst. 1971). For many years, Washington had resolved choice of law questions using the lex loci delicti rule—applying "the law of the place of wrong." *Johnson*, 87 Wn.2d at 580; *see also Richardson v. Pac. Power & Light Co.*, 11 Wn.2d 288, 299, 118 P.2d 985 (1941) ("It is the universal rule that the existence and nature of a cause of action for tort are governed by the law of the place where the alleged wrong was committed."). Lex loci delicti, endorsed by *Restatement of Conflicts of Laws* (Am. L. Inst. 1934), resolves choice of law disputes based solely on a single determinative fact: the place of conduct or injury. R. Harvey Chappell Jr., *Lex Loci Delicti and Babcock v. Jackson*, 7 WM. & MARY L. REV. 249 (1966).

In the 1950s, legal scholars, dissatisfied with the rigidity and mechanical application of the first *Restatement*, led a "choice-of-law revolution," advocating for a more flexible, issue-specific approach that better served the "policies and interests of the respective states." Symeon C. Symeonides, *The Choice-of-law Revolution Fifty Years After Currie: An End and a Beginning*, 2015 U. ILL. L. REV. 1847, 1850, 1917 (2015); Brainerd Currie, *Comments on* Babcock v. Jackson*, a Recent Development in Conflict of Laws*, 63 COLUM. L. REV. 1233, 1234 (1963). This nuanced approach, known as issue-by-issue analysis, formed the foundation for *Restatement (Second) of Conflict of Laws*, published in 1971. Symeon C. Symeonides, *Issue-by-Issue Analysis and Dépeçage in Choice of Law: Cause and Effect*, 45 U. TOL. L. REV. 751, 752-53 (2014) (hereinafter *Issue-by-Issue*).

The *Restatement (Second)* requires courts to first follow a legislature's statutory directive on choice of law. RESTATEMENT (SECOND) § 6(1). If no such directive exists, courts apply the "law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." *Id*. at § 145(1). The § 6 principles are not exhaustive, and courts are instructed to weigh the factors differently depending on the issue. *Id.* § 6 cmt. c. These principles may include

 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative
 interests of those states in the determination of the particular issue,

13

(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Id.* § 6(2). In applying these principles to determine which state has the most significant relationship to an issue in tort, the court considers the following contacts:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2). "[C]ontacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Washington was an early adopter of *Restatement (Second)*. *See Baffin Land Corp. v. Monticello Motor Inn, Inc.*, 70 Wn.2d 893, 898, 425 P.2d 623 (1967) (finding the draft of *Restatement (Second)* to be more rational and "consistent with the standards of equity, fair play and justice" in a contract choice of law issue). In the 1976 tort case *Johnson*, we rejected the lex loci delicti rule in favor of applying *Restatement (Second)* to determine whether Washington or Kansas law provided the applicable law on damages in a wrongful death claim. 87 Wn.2d at 580. *Johnson* involved a Kansas resident who died in Kansas following a scaffolding collapse. *Id.* at 578. The scaffolding had been designed and manufactured in Washington by Washington-based corporations. *Id.* at 580-81. The decedent's estate filed a

wrongful death claim in Washington against the manufacturers, alleging that the scaffolding was defectively designed and failed to withstand normal use. *Id.* at 578. At issue was which state's damages law should apply—Kansas law imposed a $50,000 cap on damages in wrongful death actions, while Washington law contained no limitation. *Id*. at 578-79.

To determine the appropriate choice of law, we began by assessing each state's contacts and identifying which were "most significant" to the cause of action. *Id.* at 581. On the one hand, the defendants were Washington corporations that designed, tested, manufactured, and advertised the scaffold in Washington. *Id.* The product was shipped from Washington to Kansas, and Washington law established the scaffold's safety standards. *Id.* On the other hand, the plaintiff and decedent were Kansas residents, the injury occurred in Kansas, and the scaffold was not purchased directly from the corporations in Washington but ordered through a Kansas distributor for use in the Kansas-based business. *Id.* Recognizing that each state had a "distinct relationship" with the parties and the injury, the court concluded that the contacts were evenly balanced. *Id.* at 582.

We next examined the interests and policies of each state, including the purpose sought to be achieved by each state's laws. Kansas's wrongful death law, which limited recoverable damages, was primarily intended to protect Kansas residents from excessive liability—not Washington residents. *Id.* at 583. By

contrast, Washington's wrongful death law, which had no limit on damages, was designed to "deter tortious conduct" and "encourage respondents to make safe products for its customers." *Id.* We reasoned that the "'sting of unlimited recovery . . . more effectively penalize[s] the culpable defendant and deter[s] it and others similarly situated from such future conduct.'" *Id.* (alterations in original) (italics and internal quotation marks omitted) (quoting *Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 583-84, 522 P.2d 666, 114 Cal. Rptr. 106 (1974). We observed that because all of the defendants were Washington corporations, Washington's interest was "clearly advanced by the application of its own law," whereas Kansas had "no interest" in limiting damages for Washington corporations being sued in their own home state. *Id* at 583-84. As a result, we held that Washington's damages law applied. *Id.* at 584.

Our analysis in *Johnson* provides a clear example of a court examining a discrete issue—damages for a wrongful death claim—and applying the law of the state with the most significant relationship to that issue. We did not conduct a generalized choice of law analysis to determine whether Washington or Kansas law should govern every issue in the case. Instead, we focused solely on the issue where the state's laws conflicted, analyzed the relevant state interests to that issue, and applied the law with the most significant relationship. *See* RESTATEMENT (SECOND) § 145 cmt. d ("Each issue is to receive separate consideration if it is one which would

be resolved differently under the local law rule of two or more of the potentially interested states.").

Issue-by-issue analysis applies the same way to statutes as it does to common law causes of action. *See, e.g.*, *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 212, 875 P.2d 1213 (1994) (applying a choice of law analysis to Washington's statute of repose); *Zenaida-Garcia v. Recovery Sys. Technology, Inc.*, 128 Wn. App. 256, 266, 115 P.3d 1017 (2005) (same); *Martin v. Humbert Constr., Inc.*, 114 Wn. App. 823, 829, 61 P.3d 1196 (2003) (same); *see also Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 53-54 (E.D.N.Y. 2000) ("Choice of law rules apply equally to claims brought under common law and statutory law."). Two Washington choice of law cases— one addressing the WPLA's statute of repose and the other involving punitive damages—illustrate how the *Johnson* framework applies to distinct issues within the context of the WPLA. Depending on the results of the analysis, a single state's laws may govern all the issues or different states' laws may apply to different issues. Both outcomes are permissible under Washington law.

A good illustration of Washington's issue-by-issue approach as applied to the WPLA's repose is *Rice,* 124 Wn.2d 205. There, a forest service employee had been continuously exposed to herbicides while living and working in Oregon. *Id.* at 207. Nearly two decades after moving to Washington, the employee developed leukemia and learned of a possible link to his past chemical exposure. *Id.* Less than three

years after his diagnosis, he sued the chemical manufacturer in Washington, alleging product liability claims for failure to warn and failure to provide adequate instructions. *Id.* The manufacturer moved to dismiss the claims under Oregon's eight-year statute of repose and two-year statute of limitations. *Id.* The trial court granted the motion, concluding that Oregon had the most significant relationship to the cause of action and, under Oregon law, the claims were either time-barred or extinguished. *Id.* at 208.

On appeal, we observed that although Washington and Oregon have different limitation periods, these variations "are not subject to conflict of laws methodology." *Id.* at 210. Instead, we explained that under Washington's borrowing statute, RCW 4.18.020, "limitation periods are 'to be governed by the limitations law of a state whose law governs other substantive issues inherent in the claim.'" *Id.* at 211 (quoting UNIF. CONFLICT OF L.-LIMITATIONS ACT § 2 cmt., 12 U.L.A. 63 (Supp. 1994)). The statute has a narrow application, however. We clarified that unlike statutes of limitations, statutes of repose are not subject to the borrowing statute and may raise a conflict of substantive law. *Id.* at 212.

We then turned to determining whether Washington or Oregon law on repose should apply. We began by evaluating whether a conflict existed, noting that the parties had not specified whether the claims were brought under the WPLA or under Washington common law. Despite this uncertainty, we concluded that a conflict

existed. *Id.* If the WPLA applied, its statute of repose would bar claims after the product's useful safe life expired, presumptively at 12 years. *Id.* If the WPLA did not apply, Washington law imposed no period for repose. *Id.* In contrast, Oregon's statute of repose imposed an absolute bar on liability after 8 years. *Id.* We concluded that whether governed by the WPLA or Washington common law, Washington and Oregon law conflicted on the issue of repose. *Id.* at 213.

After identifying the conflict, we next examined each state's contacts and corresponding state interests as they related to repose. The plaintiff was domiciled in Washington, their injury was discovered there, and Washington had a "real interest" in ensuring that its residents were compensated for injuries. *Id.* at 216. However, we noted that residency alone is not a sufficient basis to apply forum law. *Id.* By contrast, we found that Oregon had a strong interest in providing repose for manufacturers doing business in Oregon and whose products were used there. *Id.* Oregon also had an interest in regulating "allegedly dangerous or mislabeled products" shipped to and used within its borders—an interest that we highlighted is not extinguished simply because the exposed individual "later moves to another state."[3] *Id.* Weighing these interests, we held that Oregon had the most significant

---

[3] The parties did not argue that either Washington or Oregon was the place of the defendant's main headquarters, state of incorporation, place where the product was designed or tested, place where appropriate warnings for the label were determined, or place where the product was labeled. *Rice*, 124 Wn.2d at 214. Neither did the parties contend that the law of Michigan, where Dow's headquarters are located, should apply.

19

relationship to repose and, therefore, Oregon's statute of repose applied to bar the plaintiff's claims. *Id.* We also applied Oregon's statute of limitations, stating in a single sentence, "[T]he application of Oregon law to the substantive claim requires the application of the Oregon limitation period as well." *Id.* at 217.

Pharmacia interprets *Rice* to suggest that statutes of repose are inseparable from the substantive law underlying the claim. However, *Rice* did not establish that the state's law governing liability automatically dictates the application of that state's statute of repose. Notably, the parties in *Rice* did not dispute which state's law governed the substantive basis for liability, and we did not evaluate each state's competing interests in applying its liability law. Instead, we focused on each state's interests and policies specifically as they pertained to repose. It is this method of analysis, not the particular outcome, that is most significant. *See also, e.g.*, *Gantes v. Kason Corp.*, 145 N.J. 478, 679 A.2d 106, 109 (1996) (finding that characterization of Georgia's statute of repose as substantive did not preclude issue-by-issue analysis and concluding the law of the place of the tortious conduct governed repose). When addressing conflicts of law involving the WPLA's statute of repose, we treat repose as a distinct issue and apply a separate choice of law analysis.

By its nature, issue-by-issue analysis may result in two states' laws applying to govern different issues in the same cause of action. Scholars sometimes refer to

this result as "dépeçage," French for dismemberment. *Issue-by-Issue*, *supra*, at 755, n.26. However, we note that "dépeçage" has also been used to broadly refer to the analytical method of issue-by-issue analysis. *See* BLACK'S LAW DICTIONARY 551 (12th ed. 2024) (defining "dépeçage" as "[a] court's application of different state laws to different issues in a legal dispute; choice of law on an issue-by-issue basis"); *Issue-by-Issue*, *supra*, at 757 (identifying that courts have referred to "dépeçage as a 'mystical doctrine,' a plain 'doctrine,' a 'legal theory,' an 'approach,' a 'principle,' a 'rule,' a 'technique,' or a 'process'" (footnotes omitted) (quoting *Marakova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000); *Burlington N. & Santa Fe Ry. Co. v. ABC-NACO*, 389 Ill. App. 3d 691, 906 N.E.2d 83, 93 (2009); *Act I, LLC v. Davis*, 2002 WY 183, 60 P.3d 145, 149; *Buchanan v. John Doe*, 246 Va. 67, 431 S.E.2d 289, 291 (1993); *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 53 (Alaska 2001); *Trivelloni-Lorenzi v. Pan Am. World Airways, Inc.*, 821 F.2d 1147, 1174 (5th Cir. 1987) (Gee, J., concurring in part and dissenting in part); *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 879 N.E.2d 893, 901, 316 Ill. Dec. 505 (2007))). The Court of Appeals approach in this case appears to use the term in this broader sense, as the court began by asking "whether dépeçage is appropriate here," or, in other words, "whether it is appropriate to treat the statute of repose separately from the portions of WPLA imposing liability." *Erickson*, 31 Wn. App. 2d at 118. Our analysis will benefit

21

from understanding and employing the more precise definition of "dépeçage"—not as synonymous with "issue-by-issue analysis" but rather as reflecting "the potential and occasional *result* of issue-by-issue analysis." *Issue-by-Issue*, *supra*, at 757. To be clear, Washington courts should always engage in issue-by-issue analysis when resolving a dispute about choice of law, and dépeçage is a potential result of that analysis.

A common concern regarding dépeçage is whether applying different states' laws to separate issues within a single cause of action interferes with the purpose of a state law or policy decision. *Id*. at 759 (Dépeçage must be avoided when two rules of the same state are "so closely interrelated . . . that applying the one rule without the other would drastically upset the equilibrium established by the two rules and would distort and defeat the policies of that state."); *Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059, 1064 (10th Cir. 1992) (holding dépeçage is inappropriate "when used to fragment issues related to a common purpose or to legitimatize a smorgasbord approach which inures only to the benefit of the party picking and choosing"). However, if applying a particular state's laws would not meaningfully advance that state's policies, courts have broad discretion to prevent such outcomes by properly weighing each state's interests and applying the law whose interests and policies are best served. *Issue-by-Issue*, *supra*, at 759-60.

Prior to this case, only three Washington opinions have used the term dépeçage, all from the Court of Appeals.[4] *See FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 175 Wn. App. 840, 856 n.15, 309 P.3d 555 (2013) ("Under the principle of dépeçage, different issues in a single case arising out of a common nucleus of facts may be decided according to the substantive law of different states."); *Pope Res., LP v. Certain Underwriters at Lloyd's of London*, 19 Wn. App. 2d 113, 123 n.21, 494 P.3d 1076 (2021) (quoting *FutureSelect*, 175 Wn.2d at 857 n.15); *Hai v. STL Int'l, Inc.*, No. 43877-1-II, slip op. at 4 n.1 (Wash. Ct. App. Apr. 15, 2014) (unpublished) (clarifying that "the principle of dépeçage allows for the application of different substantive state law only to different legal claims, not different defendants on the same claim"), https://www.courts.wa.gov/opinions/pdf/D2%2043877-1-II%20%20Unpublished%20Opinion.pdf.  Notably, while the term dépeçage was not expressly mentioned, at least one published Washington choice of law case, *Singh*

---

[4] Federal courts applying Washington's choice of law rules have used the term more frequently, referring to it both in the broader sense described above as well as a specific result. *Compare Experience Hendrix, LLC v. HendrixLicensing.com, LTD*, 766 F. Supp. 2d 1122, 1136 (W.D. Wash. 2011) ("Although some states do not follow the rule of dépeçage, Washington does."); *Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d 1235, 1239 (W.D. Wash. 2014) ("Washington follows the rule of d[é]pe[ç]age."), *with Nazar v. Harbor Freight Tools USA Inc.*, No. 2:18-CV-00348-SMJ, 2019 WL 2066127, at *1 (E.D. Wash. Mar. 8, 2019) (court order) (recognizing that under the principle of dépeçage, the "court may apply the laws of one state to a plaintiff's request for compensatory damages and apply the laws of another for punitive damages"); *Milgard Mfg., Inc. v. Ill. Union Ins. Co.*, No. C10-5943 RJB, 2011 WL 3298912, at *3 (W.D. Wash. Aug. 1, 2011) (court order) ("Washington follows the rule of dépeçage, which may require the Court to apply the law of one forum to one issue, while applying the law of a different forum to another issue in the same case.").

*v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 210 P.3d 337 (2009), applied Washington law to liability while applying another state's law to govern punitive damages.

In *Singh*, a Washington resident was injured in a Washington hospital as a result of a defective heart monitor used during surgery. *Id*. at 140. The patient filed product liability claims under the WPLA against the California-based manufacturer, alleging design defect, construction defect, failure to warn, and postsale failure to warn, and also brought common law claims for violation of the Consumer Protection Act, intentional infliction of emotional distress, and fraudulent misrepresentation. Second Am. Compl. for Damages & Pleading Foreign Law at 4-5, *Singh v. Edwards Lifesciences Corp.*, No. 05-2-12213-5 (King County Super. Ct., May 24, 2007). The patient sought punitive damages for all claims under California law. *Id*.

To determine whether Washington or California law governed the availability of punitive damages, the court examined each state's contacts, policies, and interests specific to that issue. While the injury occurred in Washington, the court emphasized that the conduct causing the injury occurred in California. *Singh*, 151 Wn. App. at 146-47. Specifically, the manufacturer was headquartered in California, the defect in the monitor's software was discovered there, and the decision not to recall or warn consumers was also made in California. *Id*. The court found that when a company headquartered in California engages in tortious conduct within the

24

state that leads to the plaintiff's damages, "California ha[s] the greater interest in deterring such fraudulent activities." *Id*. at 140. In contrast, the court found that "[e]ven though Washington has a strong policy against punitive damages, it has no interest in protecting companies that commit fraud." *Id*. Considering these interests, the court concluded that while the WPLA applied to govern liability and compensatory damages, California had a more significant relationship to the issue of punitive damages. As a result, California law governed only that specific issue. *Id*. at 148; *see also Barr v. Interbay Citizens Bank*, 96 Wn.2d 692, 635 P.2d 441 (1981) (applying a choice-of-law analysis specific to the issue of punitive damages).

Pharmacia argues that *Singh* is distinguishable because its claims included not only WPLA claims but also common law claims, and the opinion did not address whether dépeçage was appropriate. It contends that *Restatement (Second)* § 171 mandates that the "'law selected by application of the rule of § 145,' which governs choice of law for liability, 'determines the measure of damages,' including 'the right to exemplary damages.'" Suppl. Br. of Resp't/Cross-Pet'r Pharmacia LLC (Suppl. Br. of Resp't) at 21 (quoting RESTATEMENT (SECOND) § 171 cmt. d.). This argument is based on a flawed premise. It assumes § 145 determines only the law of liability. In fact, § 145 provides a general framework "applicable to all torts and to all issues in tort." RESTATEMENT (SECOND) § 145 cmt. a. The reporter's note to § 171 clarifies,

"The law governing the right to exemplary damages need not necessarily be the same as the law governing the measure of compensatory damages."

In addition, although not expressly stated, the *Singh* court did consider whether dépeçage was appropriate in its analysis. That inquiry is embedded within issue-by-issue analysis as part of the most significant relationship test. The court evaluated whether applying each state's law would further the underlying purpose and policies of those laws. Washington law favors full compensation for injured plaintiffs but rejects punitive damages as an improper "windfall." *Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 574, 919 P.2d 589 (1996); *see Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 53, 25 P. 1072 (1891) (disapproving of punitive damages on the ground that compensatory damages make the plaintiffs "entirely whole" and "[s]urely the public can have no interest in exacting the pound of flesh"). In contrast, California law permits punitive damages to "deter[] its corporations from engaging in such fraudulent conduct." *Singh*, 151 Wn. App. at 148.

Applying Washington law to determine liability and compensatory damages while applying California law to punitive damages respects the policy interests of both states. As the *Singh* court observed, Washington has "no interest in protecting companies that commit fraud." *Id.* at 140; *see also Kammerer v. W. Guar. Corp.*, 96 Wn.2d 416, 422, 635 P.2d 708 (1981). By considering the policy and purpose behind each state's laws, the court applied the most significant relationship test in a

26

manner that advances, and does not distort, each state's interests with respect to the particular issue.

Washington's cases on choice of law reflect a commitment to providing a "nuanced, individualized, and . . . rational, resolution" to conflicts of law problems. *Issue-by-Issue*, *supra*, at 754. We affirm the choice of law principles established over five decades ago in *Johnson*. Absent a statutory directive, when the laws of interested states conflict—whether concerning punitive damages or repose, or whether the law is defined by common law or by statute—courts must conduct a separate choice of law analysis for each issue. The potential result of such analysis is that in some instances, one state's law may govern liability while another state's law may govern a different issue within the same cause of action. This issue-by-issue approach has guided Washington's choice of law analysis for the last 50 years.

With this background in mind, we turn to resolving the choice of law disputes in this case. We first address Pharmacia's argument that the legislature intended for the WPLA to require that Washington law governs the issues of repose and punitive damages for every claim brought under the WPLA.

B. The WPLA does not override Washington choice of law rules and require the application of Washington law to every issue arising in a claim under the WPLA

When engaging in a choice of law analysis, courts must first determine if there is an actual conflict of law. *Erwin*, 161 Wn.2d at 692. An actual conflict exists

where the result of an issue is different under the laws of two or more interested states. *Woodward v. Taylor*, 184 Wn.2d 911, 918, 366 P.3d 432 (2016). If there is no conflict, the local law of the forum applies. *Id.* We have previously recognized that both statutes of repose and punitive damages are issues that may create a conflict of substantive law. *See Rice*, 124 Wn.2d at 212 (repose); *Kammerer*, 96 Wn.2d at 421 (punitive damages).

Here, an actual conflict exists between Washington and Missouri law regarding the availability of repose and punitive damages in product liability claims. The WPLA includes a statute of repose, codified at RCW 7.72.060, that limits the liability of product sellers by establishing a presumptive 12-year useful safe life for products. It states,

> (1) Useful safe life. . . . [A] product seller shall not be subject to liability to a claimant for harm under this chapter if the product seller proves by a preponderance of the evidence that the harm was caused after the product's "useful safe life" had expired.
>    "Useful safe life" begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner. . . .
>    . . . .
>    (2) Presumption regarding useful safe life. If the harm was caused more than twelve years after the time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by a preponderance of the evidence.

RCW 7.72.060. In contrast, Missouri law does not contain a statute of repose for product liability claims. *See Lay v. P&G Health Care, Inc.*, 37 S.W.3d 310, 321-22

(Mo. Ct. App. 2000) (rejecting application of statute of repose in a case involving improvements to real property with respect to activities associated with selling a defective product).

Washington and Missouri law also conflict concerning the availability of punitive damages. Under Washington law, punitive damages are not recoverable unless expressly authorized by statute, and the WPLA provides no such authorization. *Kammerer*, 96 Wn.2d at 421. In contrast, Missouri law allows punitive damages in tort cases whenever the plaintiff proves that the defendant showed "'complete indifference to or conscious disregard for the safety of others.'" *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. Ct. App. 2017) (discussing standards for allowing punitive damages in a products liability case (quoting *Jone v. Coleman Corp.*, 183 S.W.3d 600, 610 (Mo. Ct. App. 2005)); MISSOURI APPROVED JURY INSTRUCTIONS: CIVIL 10.02 (8th ed. 2022). Because the result would be different depending on whether Washington or Missouri law applied, there is a conflict requiring a choice of law analysis.

Once a conflict of law is identified, *Restatement (Second)* requires courts to follow a statutory directive on choice of law, if one exists. RESTATEMENT (SECOND) § 6. Such directives need not be explicitly stated. *Id.* § 6 cmt. b. Instead, courts are tasked with giving a statute "the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect."

29

*Id.* "If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it" without conducting further choice of law analysis. *Id.* However, the "normal presumption" is that a "statute leaves the state's ordinary choice-of-law principles untouched." Caleb Nelson, *State and Federal Models of the Interaction between Statutes and Unwritten Law*, 80 U. CHI. L. REV. 657, 667, 668 (2013); *see* RESTATEMENT (SECOND) § 6 cmt. c ("Legislatures usually legislate . . . only with the local situation in mind."). In the absence of a legislative directive, *Restatement (Second)* instructs courts to apply the law of the state with the most significant relationship to the specific conflicting issue. RESTATEMENT (SECOND) § 145.

Here, we find no evidence in the WPLA that the legislature intended to provide courts with a directive on choice of law for either repose or punitive damages. The WPLA's statute of repose states, "[A] product seller shall not be subject to liability to a claimant for harm under this chapter if the product seller proves by a preponderance of the evidence the harm was caused after the product's 'useful safe life' had expired." RCW 7.72.060(1). The act defines "product seller" as "any person or entity that is engaged in the business of selling products." RCW 7.72.010(1). Pharmacia argues that the phrase "'a product seller *shall not* be subject to liability to a claimant for harm *under this chapter*'" means that the statute of repose applies to every product seller and to every claim brought under the WPLA.

30

Appellant Pharmacia LLC's Reply Br. at 12, 19 (Wash. Ct. App. No. 83287-5-I (2022)) (quoting RCW 7.72.060(1)(a)). The Court of Appeals agreed, concluding that the legislature intended to make "the statute of repose mandatory to the existence of a WPLA claim." *Erickson*, 31 Wn. App. 2d at 123. We disagree.

The WPLA was enacted five years after this court adopted *Restatement (Second)* in *Johnson*, and that case reflects Washington common law on choice of law. Common law is not to be lightly discarded—it is as much "a part of the law as any other branch of the state's law." RESTATEMENT (SECOND) § 5 cmt. a. A statute will not be read "[t]o abrogate the common law" without "'clear evidence of the legislature's intent.'" *Dearinger v. Eli Lilly & Co.*, 199 Wn.2d 569, 575, 510 P.3d 326 (2022) (quoting *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 77, 196 P.3d 691 (2008)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012) ("Statutes will not be interpreted as changing the common law unless they effect the change with clarity."). Such evidence is absent here.

While the WPLA provides the substantive provisions to determine product liability under Washington law, it does not purport to modify Washington's choice of law rules. The WPLA applies broadly to all product sellers, and nothing in its text, legislative history, or subsequent interpretations suggests that the legislature intended the WPLA to entirely displace the common law. *See* SENATE SELECT

31

COMMITTEE ON TORT & PRODUCT LIABILITY REFORM FINAL REPORT (Jan. 1981) (hereinafter FINAL REPORT). Instead, the WPLA expressly preserves the common law, including *Johnson*, by stating that the "applicable law . . . is modified only to the extent set forth in this chapter." RCW 7.72.020(1). We presume legislation to be consistent with prior judicial decisions. *In re Marriage of Williams*, 115 Wn.2d 202, 208, 796 P.2d 421 (1990).

The dissent makes the same assumption as the Court of Appeals and Pharmacia that the WPLA's inclusion of a statute of repose reflects a choice of law determination. Dissent at 7 (concluding that "the WPLA's statute of repose inheres in *all* WPLA claims" (emphasis added)). This argument would have us misconstrue the WPLA's statute of repose as an explicit legislative directive on choice of law, when in fact express choice of law provisions are different and rare. *See* RESTATEMENT (SECOND) § 6 cmt. a ("Statutes that are expressly directed to choice of law, that is to say, statutes which provide for the application of the local law of one state, rather than the local law of another state, are comparatively few in number.").

To be clear, while the WPLA contains an explicit statute of repose, it does not contain the type of language that would provide conclusive evidence of a legislative directive on when to apply one state's law over another. We do not find the "wealth of evidence" that the dissent insists exists that points to a legislative intent to provide

a directive on choice of law. Dissent at 5. Indeed, there is nothing in the language of the WPLA that directs us to ignore Washington's long-standing issue-by-issue approach to choice of law and instead apply the WPLA repose provision regardless of our choice of law rules.

The legislature has shown that it knows how to modify choice of law rules when it wishes to do so. Just two years after the legislature enacted the WPLA, the legislature enacted the Uniform Conflict of Laws–Limitations Act, known as the "borrowing" statute, which expressly removes statutes of limitations from *Johnson*'s most significant relationship test. *See* LAWS OF 1983, ch. 152 (codified at RCW 4.18.020). The act mandates that the law governing the substantive claim also determines the applicable statute of limitations, eliminating the need for a separate choice of law analysis. The legislature has enacted no such provision with respect to statutes of repose, which are well understood as distinct from statutes of limitation. *Rice*, 124 Wn.2d at 211-12 (concluding that "statutes of repose are to be treated not as statutes of limitation, but as part of the body of a state's substantive law in making choice-of-law determinations").

The WPLA likewise does not require the application of Washington law to limit punitive damages in every claim brought under the WPLA. It states that manufacturers may be subject to liability for "harm . . . proximately caused by" violations of the statute. RCW 7.72.030(1)-(2). The legislature defined "harm" as

"any damages *recognized by the courts of this state*." RCW 7.72.010(6) (emphasis added). Pharmacia argues that because Washington does not "recognize" punitive damages, the WPLA precludes the application of punitive damages under another state's law. Suppl. Br. of Resp't at 17. However, there is a critical distinction between damages being "available" under Washington law and damages being "recognized" by the courts of Washington. "Recognize" is defined as "to acknowledge" or "admit the . . . validity of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1896 (2002). Under choice of law principles, Washington courts have acknowledged and awarded damages under the laws of other states, even when such damages would not be available under Washington law. *See Kammerer*, 96 Wn.2d 416 (awarding punitive damages under California law); *Singh*, 151 Wn. App. 137 (same); 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 110.00 (6th ed. 2012) ("Washington courts will apply the punitive damages law of other jurisdictions in product liability cases, if warranted under choice of law principles. In such a situation, the jury instructions on punitive damages should conform to the laws of the other state.").

The scope of harm recognized under the WPLA was intended to be expansive. Although most of the WPLA's definitional provisions are based on the Model Uniform Product Liability Act (UPLA), 44 Fed. Reg. 62,714 (Oct. 31, 1979), the Senate special committee tasked with drafting the WPLA explained that it

34

intentionally chose not to adopt the UPLA's more restrictive definition of "harm," which limited remedies to statutorily designated categories.[5] FINAL REPORT, *supra*, at 32. Instead, the committee adopted a "broad definition," "allowing for the continued development of the concept through case law." *Id.*

The committee also chose not to adopt the UPLA's provision on punitive damages,[6] a decision that Pharmacia argues clearly demonstrates the legislature's intent to prohibit punitive damages for any claims brought under the WPLA. However, this deviation from the UPLA simply reflects Washington's policy decision to not allow punitive damages as a matter of its own substantive law. There is no indication that the legislature intended to prohibit punitive damages when authorized under the law of another state. The WPLA provides for "damages recognized by the courts of this state," and Washington courts have repeatedly recognized and awarded punitive damages under another state's law when consistent with Washington's choice of law principles. RCW 7.72.010(6).

---

[5] As defined in the UPLA, "Harm . . . includes physical harm to persons and property. This Act provides that harm may manifest itself as damage to property, disability, including personal physical injuries and illness, death, and mental anguish or emotional harm attendant to such disability or death. It also includes mental anguish or emotional harm in circumstances in which the claimant is actually placed in personal danger, and the mental anguish or emotional harm is accompanied by substantial objective symptomatology." 44 Fed. Reg. § 102(F) at 62,719 (italics omitted).

[6] The UPLA provides, **"Punitive damages may be awarded to the claimant if the claimant proves by clear and convincing evidence that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers, or others who might be harmed by the product."** *Id.* § 120(A) at 62,748.

For the reasons stated above, we conclude the WPLA contains no statutory directive requiring the exclusive application of Washington law to repose and punitive damages. We now apply *Johnson*'s most significant relationship test to the facts of this case.

C. Under the most significant relationship test, Missouri has a stronger interest than Washington in having its law applied to determine the availability of repose and punitive damages

Courts have somewhat artificially described the most significant relationship test as a two-step inquiry—first, evaluating relevant contacts and then, if evenly balanced, assessing each state's policies and interests. However, the analysis ultimately requires consideration of all the factors. Courts must evaluate each state's contacts in light of the principles set out in *Restatement (Second)* § 6 and also must examine each state's interests and policies as related to the particular issue. This requires analyzing the "'purpose sought to be achieved'" by each state's relevant laws. *Johnson*, 87 Wn.2d at 582 (italics omitted) (quoting RESTATEMENT (SECOND) § 175 cmt. d). For personal injury actions, courts presume that the law of the state where the injury occurred applies unless another state has a more significant relationship. RESTATEMENT (SECOND) § 146.

We recognize that both Washington and Missouri have a distinct relationship to the parties and the cause of action in this case. The plaintiffs are Washington residents who filed product liability claims in Washington for injuries sustained in

36

Washington. Pharmacia had contacts with Washington—it maintained offices in Washington, sold the product in Washington, and the product was installed in a Washington public school. On the other hand, the allegedly tortious conduct—the defective design, manufacturing, and failure to warn—primarily occurred at Pharmacia's headquarters in Missouri, where decisions regarding marketing, medical testing, labeling, and health and safety standards were made. Further, Erickson had no direct interaction with Pharmacia, as the injuries arose from a defective product that had been purchased and installed by a third party long before Erickson's exposure at the school.

With these relevant contacts in mind, we now consider each state's interests concerning the two disputed issues: repose and punitive damages.

1. Missouri has a stronger interest in applying its law on repose

We begin by evaluating the policies and interests behind each state's laws on repose. The WPLA was enacted in response to a perceived "product liability crisis" in the early 1970s, when rising product liability insurance premiums prompted calls for federal and state legislative reform. FINAL REPORT, *supra*, at 13. At the federal level, the U.S. Department of Commerce formed a task force to research the issue, leading to publication of the UPLA in 1979, intended for voluntary adoption by the states. *See* 44 Fed. Reg. 62,714. At the same time, Washington policymakers

pursued state specific product liability reforms. After multiple failed attempts to pass legislation, the senate created a special committee to conduct a thorough review of the need for product liability reform in Washington. FINAL REPORT, *supra*, at 2-3. Over an 18-month period, the committee reviewed the federal task force report, analyzed other states' legislative efforts, consulted experts and stakeholders, held public hearings, and surveyed insurance companies operating within Washington. *Id.* at 16-19. The committee focused on identifying the root causes of the sharp rise in insurance prices and, specifically, whether it resulted from insurance underwriting practices or the existing state of tort law. 1 SENATE JOURNAL, 47th Leg., Reg. Sess., at 619 (Wash. 1981).

In January 1981, the committee published a final report containing its findings, explanations for how the research informed its recommendations, and a draft product liability bill, S.B. 3158, heavily modeled after the UPLA. The committee acknowledged "the national character of product manufacturing and marketing" and stated that the bill was intended to contribute to a "measure of uniformity" in product liability law. FINAL REPORT, *supra*, at 15, 16. The WPLA's preamble reflects the legislature's intent to balance two key interests: (1) preserving "the right of the consumer to recover for injuries sustained as a result of an unsafe product," and (2) protecting "retail businesses located primarily in the state of Washington . . . from the substantially increasing product liability insurance costs

38

and unwarranted exposure to product liability litigation." LAWS OF 1981, ch. 27, § 1. The pursuit of these two primary interests is reflected in the WPLA's statute of repose, which aims "to bring some certainty" for product sellers and manufacturers by limiting the period in which they may be held liable for harm caused by a defective product. FINAL REPORT, *supra*, at 19. At the same time, the legislature sought to balance this business interest with the consumer interest in "preserving" the right to receive compensation for harm caused by defective products. *Id.* Rather than imposing a fixed cutoff date for immunity, which would have provided absolute certainty for product insurers, the legislature adopted a more consumer-friendly repose provision that incorporated the UPLA's flexible concept of a "useful safe life." *Id.* at 42. A product's "useful safe life" begins at delivery and "extends for the time during which the product would normally be likely to perform or be stored in a safe manner." RCW 7.72.060(1).

To further mitigate the burden of a repose provision on consumers, the legislature diverged from the UPLA in two notable ways. First, it extended the presumptive useful safe life from 10 years to 12 years, and second, it lowered the burden of proof for consumers challenging the presumption after 12 years from clear and convincing evidence to a preponderance of the evidence. *Compare* RCW

7.72.060(2), *with* UPLA § 110.[7]  These modifications reflect the WPLA's broader goal to "create a fairer and more equitable distribution of liability among parties at fault."  LAWS OF 1981, ch. 27, § 1.

Erickson argues that Washington has no compelling interest in applying its statute of repose to shield an out-of-state corporation from liability, particularly when doing so may prevent Washington citizens from receiving full compensation. This argument goes too far, however.  Washington certainly has a legitimate interest in enforcing its laws consistent with the policy objectives underlying the WPLA. The WPLA's statute of repose promotes nationwide uniformity in product liability standards and helps to curb rising product liability insurance costs—objectives potentially furthered by applying the WPLA's statute of repose in every circumstance.  In addition, the statute's expansive definition of "product seller" and "manufacturer" reflect Washington's interest in protecting all those doing business within the state from extended liability.  *See* RCW 7.72.010(1), (2).

---

[7] Sec. 110. *Length of Time Product Sellers are Subject to Liability*
    (A) *Useful Safe Life*.
    (1) Except as provided in Subsection (A)(2), a product seller shall not be subject to liability to a claimant for harm under this Act if the product seller proves by a preponderance of the evidence that the harm was caused after the product's "useful safe life" had expired. . . .
      . . . .
    (B) *Statute of Repose*.
    (1) *Generally*. In claims that involve harm caused more than ten (10) years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence.
    *Id*. at 62,732.

But that is not all that we must consider. The question is not merely whether Washington has an interest in applying its statute of repose but rather whether that interest outweighs Missouri's interest in applying its own laws. The twin purposes of the WPLA are to preserve the right of consumers to recover for injuries and to protect retail businesses primarily located within Washington. LAWS OF 1981, ch. 27, § 1. Applying the WPLA statute of repose to potentially limit a Washington citizen's ability to recover against an out-of-state corporation does not serve either of those purposes.[8]

This case is similar to *Zenaida-Garcia*, where the Court of Appeals concluded that Oregon's interest in limiting the liability of an out-of-state corporation through the application of its statute of repose was outweighed by Washington's competing

---

[8] Pharmacia contends that applying Missouri law to the issue of repose or punitive damages for an out-of-state corporation—while hypothetically applying Washington law to an in-state corporation for the same tortious conduct—would result in violation of the dormant commerce clause. However, Pharmacia does not raise a constitutional challenge. Instead, it appears to argue that the principles of constitutional avoidance compel such a result. Pharmacia cites no authority supporting the claim that a court's application of another state's law under a choice of law analysis violates the dormant commerce clause or that a state unconstitutionally discriminates against an out-of-state resident by applying the law of the resident's home state. "[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion." *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) (internal quotation marks omitted) (quoting *In re Rosier*, 105 Wn.2d 606, 616, 717 P.3d 1353 (1986)). The U.S. Supreme Court has explained that to avoid "infringing on the policy choices of other States," a sovereign state's limit on remedies "must be supported by the State's interest in protecting its own consumers and its own economy." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). Far from interfering with interstate commerce or federalism, issue-by-issue analysis ensures that choice of law decisions "further harmonious relations between states" and "facilitate commercial intercourse between them." RESTATEMENT (SECOND) § 6 cmt. d; *see Seizer v. Sessions*, 132 Wn.2d 642, 652, 940 P.2d 261 (1997).

interest in deterring the manufacture and sale of unsafe products within its borders. 128 Wn. App. at 266. The case involved an Oregon worker who died in an industrial accident involving a machine that was designed, manufactured, and originally sold in Washington. *Id.* at 258. The machine had been operating in Oregon for 8.5 years before the accident. *Id.* at 259. If Oregon's 8-year statute of repose applied, instead of Washington's presumptive 12-year statute of repose, it would extinguish the Oregon resident's claim.

To determine which state's law should apply, the court examined the history and purpose behind each law. It noted that the WPLA's statute of repose was 2 years longer than the UPLA's 10-year repose period, furthering "a policy of deterrence of tortious conduct, and encourag[ing] manufacturers to make safe products for consumers." *Id.* at 264-65. In contrast, Oregon's shorter 8-year repose period aimed to protect Oregon businesses and manufacturers from prolonged litigation risks. The court concluded that Washington's interest in deterring the design, manufacture, and sale of unsafe products within its borders outweighed Oregon's interest in applying its shorter statute of repose to protect a Washington corporation. *Id.* at 266. Accordingly, the court concluded the WPLA's statute of repose applied. *Id.*

The circumstances here are similar to those in *Zenaida-Garcia.* We must weigh one state's interest in limiting the liability of an out-of-state corporation against another state's interest in deterring the design and sale of unsafe products

within its borders. Significantly, Missouri has not adopted any statute of repose, a decision presumed to be intentional. As one court observed, "by not enacting a statute of repose, Missouri has expressed a policy in favor of fully compensating injured victims and a policy against providing asylum to manufacturers of defective products." *Jaurequi v. John Deere Co.*, 986 F.2d 170, 175 (7th Cir. 1993). Missouri recognizes that "'[t]he primary consideration underlying a statute of repose is fairness to a defendant, [reflecting] the belief that there comes a time when the defendant ought to be secure in his *reasonable expectation* that the slate has been wiped clean of ancient obligations.'" *Grosshart v. Kan. City Power & Light Co.*, 623 S.W.3d 160, 168-69 (Mo. Ct. App. 2021) (emphasis added) (internal quotation marks omitted) (quoting *Ambers-Phillips v. SSM DePaul Health Ctr.*, 459 S.W.3d 901, 908 n.7 (Mo. 2015)).

Pharmacia could not have reasonably expected the WPLA's statute of repose to immunize it from liability for tortious conduct committed in Missouri. Pharmacia marketed and sold PCBs in every state; the place of injury in Washington was merely fortuitous. Moreover, Pharmacia certainly could not have relied on the protections of the WPLA because it ceased production of PCBs four years before the WPLA was even enacted. In contrast, Pharmacia could reasonably have anticipated liability to the full extent of Missouri law, as Missouri is home to its headquarters, medical department, marketing, sales, and public relations departments. All relevant

decisions concerning PCB design, the discovery of the dangers of PCBs, and the decision not to warn consumers were made in Missouri.

By comparison, Washington can be said to have minimal interest in applying its statute of repose to protect an out-of-state corporation. This position is consistent with other jurisdictions, which have similarly concluded that a state has little interest in allowing out-of-state corporations to take advantage of another state's statute of repose. *See, e.g.*, *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 250 (5th Cir. 1990) (finding that there is no "compelling reason" to apply the statute of repose from the place of injury in order to bar claims against out-of-state manufacturers); *Mahne v. Ford Motor Co.*, 900 F.2d 83, 88 (6th. Cir. 1990) (finding "no reason" to extend the benefits of one state's statute of repose to an out-of-state defendant), *cert. denied*, 498 U.S. 941 (1990); *Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 489 (5th Cir. 2001) (applying the repose period of the manufacturer's home state, Louisiana, to claims brought under Tennessee's products-liability statute).

Pharmacia argues that dépeçage—applying Missouri law to repose and the WPLA to liability—is inappropriate in this context. It contends that the WPLA's "integrated" statute of repose defines the scope of liability and reflects a broader legislative policy decision essential to the enactment of the act. Resp't's Answer to

Amici[9] at 18 ("'[A] statute of repose does not present an issue distinct from the underlying claim; it is part of the definition of the claim in much the same way as an element of a tort.'" (quoting Br. of *Amicus Curiae* Professor Kermit Roosevelt III in Supp. of Resp't at 16)); *see also* Br. of Erin O'Hara O'Connor et al.[10] at 8 ("[S]tate polices are reflected in each state's bundle of relevant laws."). However, we do not evaluate statutory conflicts of law differently from those based on common law. As we clearly held in *Johnson*, choice of law is issue specific. When the laws of interested states conflict, we apply the law of the state with the most significant relationship to each individual issue, regardless of whether those issues are found within a statute or under the common law.

This is not to say that applying another state's law that conflicts with the WPLA will always be appropriate. But such concerns are properly addressed by applying our long-standing "most significant relationship" analysis, not by collapsing the inquiry into a single choice of law determination under the statute. Here, applying Missouri's law, we conclude that the absence of a statute of repose does not undermine Washington's interests under the WPLA, which include preserving consumers' rights to recover for injuries and protecting retail businesses

---

[9] Resp't's Answer to Brs. of Amici Curiae L. Professors, Former SVEC Students & Their Fams. & Mo. L. Experts.

[10] Br. of Erin O'Hara O'Connor, Craig S. Lerner, and Michael E. Solimine as *Amici Curiae* in Supp. of Def.-Resp't.

located primarily within the state. At the same time, Missouri's interest in deterring tortious conduct within its borders is furthered by applying its own law here. Pharmacia has not shown that dépeçage is inappropriate in this case with respect to the issues of liability and repose.

Taking all of these considerations together, we conclude that Missouri has the most significant relationship on the issue of repose, as its interest in deterring the manufacture and sale of unsafe products within its borders outweighs Washington's interest in protecting the tortious conduct of an out-of-state corporation through its statute of repose. *See Zenaida-Garcia*, 128 Wn. App. at 266. Accordingly, we reverse the Court of Appeals and hold that Missouri law governs this issue. Because we conclude that the WPLA's statute of repose does not apply, we need not address Erickson's challenge to the constitutionality of the WPLA repose provision.

We next consider which state's law applies to the issue of punitive damages.

2. Missouri has a stronger interest in applying its law on punitive damages

The same analytical framework used in determining the applicable law on repose also applies to the issue of punitive damages. Under Missouri law, the primary purpose of punitive damages is "to punish a defendant for an aggravated act of misconduct and to deter similar conduct in the future." *Rinker v. Ford Motor Co.*, 567 S.W.2d 655, 668 (Mo. Ct. App. 1978); *see Poage*, 523 S.W.3d at 520 (finding

punitive damages appropriate even when the defendant no longer sells the defective product because punitive damages are meant to deter future misconduct and deter others who are similarly situated); *Bradshaw v. Deming*, 837 S.W.2d 592, 594 (Mo. Ct. App. 1992) (declaring that punitive damages are not intended to compensate a plaintiff; rather, they are meant to punish and deter). *Restatement (Second)* instructs that where, as here, the "primary purpose of the tort rule involved is to deter or punish misconduct," rather than "to compensate the victim for [their] injuries," that state where the tortious conduct took place may "be the state of dominant interest and thus that of most significant relationship." *Id.* §§ 145 cmt. c, 171 reporter's note to cmt. d (one state may have "the dominant interest with respect to the issue of compensatory damages and another state ha[ve] the dominant interest with respect to the issue of [punitive] damages").

We first awarded punitive damages under the laws of a different state in *Kammerer*. There, California residents filed claims against a Washington corporation for fraud and breach of contract in connection with a violation of a patent licensing agreement negotiated in California. 96 Wn.2d at 418. California law permitted punitive damages whereas Washington law did not. *Id.* at 421. In determining which state's law to apply, we reasoned that California's interest "in deterring fraudulent activities by corporations having a substantial business presence within its borders" outweighed Washington's interest in protecting corporations that

commit fraud. *Id*. at 422 (quoting *Kammerer v. W. Gear Corp.*, 27 Wn. App. 512, 520-21, 618 P.2d 1330 (1980)). We held that "a Washington court can award punitive damages under the law of California." *Id*. at 423.

That same day, we also issued our decision in *Barr*, where we held that Washington law applied to prohibit punitive damages in a dispute between a Florida bank and a Washington resident over the bank's wrongful repossession of a car in Washington. 96 Wn.2d 692. Although the decision to repossess the car occurred in Florida, it was the method used to repossess the car that served as the basis for the claim. We concluded that "[t]he interest in Florida in providing an example for deterrence would not be furthered when the actual conduct and the acts which warrant punitive damages were restricted to Nevada and Washington." *Id.* at 699.

The court's emphasis on the place of conduct for determining which state governs the issue of punitive damages is similarly reflected in *Bryant v. Wyeth*, 879 F. Supp. 2d 1214 (W.D. Wash. 2012), which we find persuasive. There, the plaintiff alleged that she developed breast cancer after ingesting hormone replacement therapy drugs manufactured by the defendant. *Id.* at 1218. The plaintiff was a resident of Washington, where the drugs were prescribed and she ingested them, and where she subsequently developed breast cancer. *Id.* at 1218-19. Although the drug manufacturer was incorporated in Delaware, its headquarters, sales team, and women's health research facility were located in Pennsylvania. *Id.* at 1219. The

plaintiff filed claims for negligence and breach of express warranty under the WPLA, along with a fraud claim seeking punitive damages under Pennsylvania law. *Id.* The defendant moved for summary judgment on the issue of punitive damages, arguing that Washington law applied. *Id.*

Applying the most significant relationship test, the court held that Pennsylvania law governed the issue of punitive damages on the plaintiff's fraud claim.[11] *Id.* at 1225. The court explained that although the plaintiff suffered her personal injury in Washington, the bulk of the allegedly fraudulent conduct occurred at the defendant's headquarters in Pennsylvania where the company created its product labels and marketing strategies. *Id.* at 1223. The court emphasized that in Pennsylvania, the "'purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct.'" *Id.* at 1225 (quoting *Hutchison ex rel. Hutchison v. Luddy*, 582 Pa. 114, 121-22, 870 A.2d 766 (2005)). The court highlighted that this "defendant-focused rationale solidifies the place where the conduct occurred as the most significant contact." *Id.*

Application of Missouri punitive damages law in this case is also consistent with *Johnson*, where we recognized that a state's interest in limiting damages to prevent financial burdens and exaggerated claims is "primarily local." 87 Wn.2d at

---

[11] The plaintiff offered no authority to support extending this holding to her WPLA claims and the court therefore declined to do so. *Bryant*, 879 F. Supp. 2d at 1220 n.5.

582-83. In contrast, a state's interest in allowing unlimited damages reflects a focus on penalizing the culpable defendant and "'deter[ring] it and others similarly situated from such future conduct.'" *Id.* at 583 (italics and internal quotation marks omitted) (quoting *Hurtado*, 11 Cal. 3d at 583-84).

Here, as in *Singh*, *Kammerer*, *Barr*, *Bryant*, and *Johnson*, the place where the tortious conduct occurred is the most significant factor in determining which state's law governs the availability of punitive damages. Erickson filed claims against Pharmacia for design defect, construction defect, failure to warn at the time of sale, and failure to warn postsale. The allegedly tortious behavior that proved these claims did not occur in Washington, the place of injury, but in Missouri, the home of Pharmacia's headquarters. Pharmacia could not reasonably expect that it would be protected from a claim for punitive damages by virtue of doing business in Washington. A company that consciously disregards the safety of people of every state can "have few, if any, justified expectations" that one state's laws limiting damages may protect it. RESTATEMENT (SECOND) § 145 cmt. b.

Applying Missouri law with respect to the availability of punitive damages, even when Washington law governs the substantive elements of liability, appropriately advances the distinct policy goals of both states. Pharmacia's tortious conduct occurred in Missouri, the place of its corporate headquarters, medical department, and sales and marketing divisions. Missouri's interest in allowing

punitive damages—"to punish a defendant for an aggravated act of misconduct and to deter similar conduct in the future"—is therefore advanced by application of its law. *Rinker*, 567 S.W.2d at 668. At the same time, Washington's policy of ensuring full compensation for injury is also fully satisfied. It is an overstatement to say that Washington law categorically "precludes" punitive damages. Suppl. Br. of Resp't at 16. It recognizes such damages when the governing law provides for them, and it should make no difference whether that governing law is expressed in statute or in another state's common law that applies to an action brought in Washington. Tailoring the application of each state's law to the issue in which it has the greater interest produces a more rational and individualized outcome than applying a single law to the entire cause of action. This issue-by-issue approach is the true achievement of *Restatement (Second)*. *See Issue-by-Issue*, *supra*, at 754.

We hold that Missouri has the most significant relationship with respect to punitive damages. It has a stronger interest in punishing companies for their conscious disregard of safety and deterring others from such actions than Washington does in limiting damages imposed on an out-of-state corporation. *See Johnson*, 87 Wn.2d at 583-84 (The state of the place of injury has "no interest applying its [damages] limitation to nonresident defendants."). Accordingly, we affirm the Court of Appeals and hold that Missouri law governs punitive damages.

3. The special verdict form was sufficient to uphold the jury's award of punitive damages under Missouri law

While the Court of Appeals correctly recognized that Missouri law governs punitive damages in this case, it incorrectly limited punitive damages to claims recognized under Missouri's substantive product liability theories, despite the parties' agreement that the WPLA governs the liability standards in this case. *Erickson*, 31 Wn. App. 2d at 138. The court reasoned that because Missouri does not clearly recognize a cause of action for postsale failure to warn, and because the jury did not distinguish which particular theory of liability supported punitive damages, the jury's award of punitive damages was unsupported. *Id*. It therefore vacated the award and remanded for a jury to consider whether claims recognized under Missouri law independently support an award of punitive damages. *Id*.

Erickson argues that the Court of Appeals erred by not predicting how Missouri courts would decide the issue of a postsale failure to warn. Had the Court of Appeals done so, Erickson contends it would have found that Missouri courts would likely recognize a postsale failure to warn claim. Pharmacia responds that deciding this issue of first impression would "impermissibly impose liability for 'conduct that may have been lawful where it occurred.'" Resp't's Answer to Amici at 37-38 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003)). Pharmacia warns that by permitting punitive damages for claims not recognized in Missouri, the court is creating "a

previously unknown Frankenstein's monster that reflects the policies of neither Washington nor Missouri and yields a windfall recovery." Suppl. Br of Resp't at 37-38.

We believe the focus of the parties' argument skips over an initial consideration that is dispositive. Given that the substantive product liability law of Washington governs the liability standards here, there is no need to determine whether Missouri would recognize a negligence-based claim for postsale failure to warn under its substantive product liability standards. The jury was properly instructed on the WPLA elements of liability, including the elements of a claim for postsale failure to warn, and the jury found Pharmacia liable. The critical question for awarding punitive damages under Missouri law is not whether Pharmacia's conduct would result in liability under Missouri product liability law but, rather, whether its conduct reflected "'complete indifference to or a conscious disregard for the safety of others'" as related to the WPLA claim. *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. 1996) (quoting *Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo. 1991)); *see also* MISSOURI APPROVED JURY INSTRUCTION 10.02. The jury was instructed on this standard and found it was met when it awarded punitive damages.

The jury instructions on damages provide the guide. The relevant instructions stated:

> A.  If you find in favor of a plaintiff under Instruction Number 20 [postsale failure to warn], and if you believe the conduct of the

53

defendant as submitted in Instruction Number 20 showed complete indifference to or conscious disregard for the safety of others, or

B. If you find in favor of a plaintiff under Instruction Number 16 [defective design], and if you believe:
(1)  First, at the time defendant sold the PCBs, defendant knew of the defective condition and danger submitted in Instruction Number 16, and
(2) Second, the defendant thereby showed complete indifference to or conscious disregard for the safety of others, or

C.  If you find in favor of the plaintiff under Instruction Number 18 [failure to warn at the time of distribution] and if you believe:
(1)  First, at the time defendant sold the PCBs, defendant knew of the danger submitted in Instruction Number 18, and
(2)  Second, defendant thereby showed complete indifference to or conscious disregard for the safety of others,

then in addition to any damages to which you may find plaintiff entitled . . . you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.

Clerk's Papers (CP) at 16549 (jury instruction 30).  The verdict form interrogatory on punitive damages asked simply, "Should punitive damages be awarded against defendant in the case of plaintiff [name]?"  CP at 16555.  Nothing in the way this case was instructed would necessitate the jury parsing the damages among the various product liability theories.  Indeed, that would seem unusual absent a situation where not all theories applied to all parties. *Cf. Blanks v. Fluor Corp.*, 450 S.W.3d 308, 364 (Mo. Ct. App. 2014) (reversing a punitive damages award against one

partner because the jury instructions required consideration of undifferentiated conduct, making it unclear whether the jury would have imposed liability based solely on that partner's conduct).

Pharmacia's suggestion that it could be made to pay punitive damages for conduct that does not give rise to liability in Missouri overlooks that the jury properly found liability under the WPLA. That finding is the premise for any damages. Importantly, this appeal does not include any challenges to the sufficiency of the evidence or to the jury instructions for misstating Missouri substantive law. Nor did Pharmacia argue that Missouri law should govern the substantive law of liability.[12] We acknowledge that there are likely differences not only between each state's substantive law for postsale failure to warn but also for the other causes of action, such as defective design. We further recognize that these differences might have impacted the outcome of this case. However, in determining which state's law should apply, we conduct choice of law analysis with respect to each particular issue. Like Washington, Missouri recognizes that different issues may be decided according to the laws of different states. *See Wilson v. Image Flooring, LLC*, 400

---

[12] Pharmacia argues that Missouri law allows for punitive damages only when certain procedural requirements are met, including a bifurcated trial, an offset of damages, or a 50 percent deposit into the state treasury. Suppl. Br. of Resp't at 39-41 (citing MO. REV. STAT. §§ 510.263(1), (4), 537.675(3)). But in mandating these requirements in 2020, Missouri's "legislature expressly stated that '[t]he provisions of this act shall apply to causes of action filed on or after August 28, 2020.'" *Largent v. Pelikan*, 628 S.W.3d 162, 165 (Mo. Ct. App. 2021) (alteration in original) (quoting MO. REV. STAT. § 510.262). As this case was filed in 2018, the statutory requirements, whether substantive or procedural, do not apply here.

S.W.3d 386, 395 (Mo. Ct. App. 2013) (Missouri applies the most significant relationship test to a "conflict-of-law issue arising in a tort case"); *see, e.g., Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 25 (Mo. Ct. App. 2004) (applying California law to a manufacturer on liability, but applying Missouri law on damages because "Missouri had the predominant interest in the issue of damages for a wrongful death occurring within its boundaries"), *abrogated on other grounds by Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. 2012). The parties had the opportunity to argue that Missouri substantive law should apply but did not do so.

The jury made proper findings under both Washington and Missouri law in accordance with the given instructions. We reverse the Court of Appeals and hold that the special verdict form was sufficient to sustain the jury's award of punitive damages.

We next turn to Pharmacia's challenge to the verdict based on the trial court's admission of expert opinion testimony.

II.    Admissibility of Expert Testimony

To be admissible in Washington courts, scientific expert testimony must satisfy both *Frye*, 293 F. 1013, and ER 702. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013). *Frye* requires that the underlying scientific theory and methodology supporting an expert's testimony be "generally accepted in

the relevant scientific community and capable of producing reliable results." *Id*. However, "*Frye* does not require every deduction drawn from generally accepted theories to be generally accepted." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 611, 260 P.3d 857 (2011). Nor is unanimous acceptance and usage in the relevant scientific community required. *Id.* at 603. Instead, *Frye* focuses on whether the underlying theory or method has general scientific consensus. *Lakey*, 176 Wn.2d at 920.

ER 702 requires the trial court to determine that the testimony will assist the trier of fact. *Id.* at 918. Unreliable testimony, including testimony from an expert who fails to adhere to an otherwise reliable methodology, is generally regarded as unhelpful and therefore inadmissible. *Id*. at 918-19. We review ER 702 rulings for abuse of discretion, and *Frye* rulings de novo. *L.M. v. Hamilton*, 193 Wn.2d 113, 118, 436 P.3d 803 (2019). Under *Frye*, "[t]he reviewing court will undertake a searching review which may extend beyond the record" and involve consideration of scientific literature, secondary legal authority, and materials that were not available until after a *Frye* hearing. *State v. Copeland*, 130 Wn.2d 244, 255-56, 922 P.2d 1304 (1996) (citing *State v. Cauthron*, 120 Wn.2d 879, 887-88, 846 P.2d 502 (1993)).

At issue are the expert opinions of industrial hygienist Kevin Coghlan, whose testimony Erickson relied on to show that the teachers were likely exposed to injury-

causing levels of PCBs during the time they taught at SVEC. Pharmacia urges us to affirm the Court of Appeals and hold that Coghlan's opinions—based on two different methods of back-calculation—should have been excluded under *Frye*, ER 702, or both. There is no dispute that Coghlan's third method, which estimates exposure by directly comparing to New York schools, does not implicate *Frye* and satisfies ER 702.

> A. The practice of exposure reconstruction is generally accepted in the field of industrial hygiene

One of the primary functions of an industrial hygienist is estimating worker exposure to chemical and physical agents. Industrial hygienists often collaborate with other disciplines, including toxicologists and epidemiologists, to make these risk assessments. While these other professionals are experts in assessing the health effects of exposure, "[d]etermination of the actual exposure is the stock-in-trade of industrial hygienists." Suppl. Rec. (SR) at 6667 (emphasis omitted). When real-time measurements of exposure cannot be conducted, industrial hygienists attempt to estimate past exposure levels using what is known as "exposure reconstruction." *Id*. at 6774. Exposure reconstruction may involve multiple quantitative and qualitative estimation methods to arrive at a range of possible exposures for each worker. The specific methods used depend on the available data and the intended use of the final estimation.

The parties do not appear to dispute that the overall practice of exposure reconstruction is generally accepted in the field of industrial hygiene. *See* Suppl. Br. of Pet'rs, App. 22 (attaching findings of fact and conclusions of law regarding Coghlan opinions in *Rose* Order). Our *Frye* analysis focuses on the two specific methods Coghlan used as part of his exposure reconstruction: (1) back-calculation from carpet samples and (2) back-calculation based on the EPA study of New York schools.

B. Coghlan's PCB estimates using carpet samples from SVEC and partition coefficients from the Guo study satisfies *Frye* and ER 702

Coghlan's back-calculation of PCBs using carpet samples relies on a concept known as "source-sink dynamics." Source-sink dynamics is used to understand how particles (e.g., PCBs) migrate from an original source (e.g., light ballasts) to materials that absorb them, known as sinks (e.g., carpet). Some objects can act as both a sink and a secondary source, re-emitting particles after they have been absorbed.

The parties do not dispute that the theory of source-sink dynamics is generally accepted in the relevant scientific communities. *See Erickson*, 31 Wn. App. 2d at 152. Specifically, they do not dispute that light ballasts are a source emitting PCBs, that carpet acts as a sink absorbing PCBs, and that air can function both as a sink and a secondary source of PCBs. Nor do the parties contest that mathematical models can be developed to describe the rate at which sources emit PCBs and sinks

absorb them under specific conditions. Rather, Pharmacia contends that Coghlan's method of reversing these models to use PCB concentrations in carpet (a sink) to estimate past concentrations of PCBs in the air (a source) is not generally accepted.

Coghlan's method relies heavily on the work of an EPA study published in 2012 known as the Guo study. This study examined how common building materials, including two types of carpet, absorb PCBs from the air in a controlled laboratory environment. The experiment used two connected chambers. In the first chamber, PCB-containing caulk acted as a stable source of PCBs, emitting the chemicals into clean air pumped in from one side. Fans then directed this air to flow into the second chamber, where the air acted as a secondary source of PCBs to be absorbed by small buttons of each building material. Throughout the test, scientists monitored PCB concentrations in the outlet air and periodically removed the buttons of building material to test their PCB concentrations. The study calculated the partition coefficient for each material, representing the ratio between the PCB concentration in the material and the PCB concentration in the surrounding air at the end of the experiment. In a section describing the study's limits, the study noted the wide variety of building materials used in the real world and cautioned that "care should be taken when applying the test results to seemingly similar materials in real-world situations." SR at 4736-37.

Coghlan acquired several samples of carpet from SVEC, which had been collected in December 2015 by Dr. Cynthia Yost, a former science teacher at the school. Dr. Yost collected the samples just before the school's carpet was replaced and prior to the start of PCB remediation. She stored them in plastic sandwich bags inside brown paper bags in her basement from 2016 until January 2019, when she provided them to Coghlan.

Coghlan used the SVEC carpet samples along with data from the Guo study to estimate past PCB concentrations in the air at SVEC. Coghlan first measured the PCB concentrations in each sample, excluding one that showed clear evidence of direct contamination by PCB-containing oil leaked from a light ballast. He divided his measured PCB concentrations by the PCB concentrations measured in the carpets in the Guo study, then multiplied by the known concentration of PCBs in the air from the Guo study. The result is the PCB concentration that likely had to be in the air at SVEC for the carpet samples to have absorbed the measured concentrations by the time the samples were collected, assuming the SVEC carpet was similar in absorbency to one of the carpets in the Guo study. Coghlan repeated this calculation with each SVEC carpet sample measurement and each carpet sample from the Guo study to produce a range of estimated PCB concentrations in the air at SVEC.

Stated differently, Coghlan applied the findings of the Guo study in reverse. The Guo study used a known concentration of PCBs in air as a source and a known

concentration of PCBs in building materials as a sink to calculate the partition coefficient. Coghlan used a known concentration of PCBs in a sink and a known partition coefficient to calculate the concentration of PCBs in a source—specifically, the air at SVEC.

During cross-examination, Coghlan admitted that to his knowledge, no one had ever used a carpet sample to back-calculate the historic concentration of PCBs in the air, nor had anyone published a peer-reviewed study involving that specific method. This admission appears to be the primary factor for the Court of Appeals conclusion that his method was novel and not generally accepted. *See Erickson*, 31 Wn. App. 2d at 152-53. On appeal, however, we have the benefit of reviewing the *Frye* hearing conducted in *Rose*, where the trial court found that using the PCB concentration in material samples to estimate prior PCB concentration in the air is generally accepted.

In *Rose,* the court heard from Dr. Lars Gunnarsen, a professor whose research focuses on the risk of PCBs in indoor environments. He testified that "[p]artition coefficients are well established, and we use them all the time." SR at 4232, 6614. Asked how he would estimate PCBs in the air from a sample of clothing, he replied, "I would look—look at my paper and find a reasonable partitioning coefficient, and then I would quantify the PCB content of the clothing and calculate back to the air." *Id.* at 4232. Dr. Brent Altemose, a certified industrial hygienist, similarly testified

that "many industrial hygienists" use partition coefficients to estimate historic exposure without even knowing the term "partition coefficient," and that if he were to try and calculate the air concentration of PCBs from a sink sample, he "would look in the literature to see if there was a partitioning coefficient that had been determined" for the same material. *Id.* at 4255, 7419. Likewise, Dr. John Price, another certified industrial hygienist, testified that he had "done a lot of work in the past of taking samplings and doing estimates" to determine "preexisting exposures without controls." *Id.* at 4246, 6653.

The supplemental record also contains multiple peer-reviewed studies involving back-calculation of chemical concentrations in air using measurements of different objects. For example, after 9/11, researchers used the "film-air partition coefficient" to estimate PCB levels in the air using measurements of window film. *Id.* at 6567. Other researchers used "previously published wood-air partition coefficients" to estimate air concentrations of different chemical compounds using measurements of tree cores. *Id.* at 6578. Lastly, one study calculated partition coefficients using carpet as a sink but studied chemical compounds other than PCBs. *Id.* at 7612.

Pharmacia does not meaningfully dispute this testimony and the scientific literature, instead focusing narrowly on the lack of evidence that anyone before Coghlan specifically used carpet samples as the sink and PCBs as the chemical

compound, or that anyone has relied on the Guo study, for exposure reconstruction. Pharmacia cites the testimony of Dr. Nadia Moore, the sole industrial hygienist it called at the *Frye* hearing, who testified that Coghlan's method was not generally accepted. When asked why, Dr. Moore, who has been an industrial hygienist only since 2020, stated that she "did a search" and "couldn't find anywhere that anyone had used carpet in peer-reviewed literature to back calculate PCBs." *Id*. at 4326. Pharmacia's other witness, Dr. Kurt Herman, contradicted Dr. Moore when he admitted that the use of partition coefficients to estimate the concentration of a chemical compound in the air is "generally accepted." *Id*. at 4371.

Pharmacia analogizes this case to *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Insurance Co.*, 176 Wn. App. 168, 313 P.3d 408 (2013), which also involved back-calculation. There, the plaintiff's expert measured a home's current wood rot and applied a formula to estimate when, in the past, the rot had reached a condition that would cause the home to collapse. *Id.* at 174. The court acknowledged that while using exponential curves to model the progression of wood rot was generally accepted, applying such models to back-calculate wood rot was not. *Id.* at 179. The court rejected the expert's claim that this approach was generally accepted, emphasizing that the expert failed to provide supporting evidence for the use of any formula—let alone the specific formula he used—to backdate the onset of a collapse condition. *Id.* Although the expert's methodology in *Lake Chelan* may

bear a general resemblance to the partition coefficients at issue here, it lacked an equivalent to the Guo study or to the established practice of using partition coefficients in exposure reconstruction.

The weight of expert testimony and peer-reviewed literature in the relevant scientific communities—industrial hygiene, environmental engineering, and research involving PCBs—demonstrates that using partition coefficients to estimate historic concentrations of chemical compounds in the air from concentrations in tangible objects is generally accepted. *Frye* requires no more than this. *See Anderson*, 172 Wn.2d at 611 (rejecting the argument that a plaintiff had to prove acceptance of the "specific causal connection" between the "specific toxic organic solvents" and the "specific polymicrogyria birth defect"). *Frye* does not require acceptance of "each discrete and ever more specific part of an expert opinion." *Id*. Instead, it simply requires that the underlying theory and the methodology be generally accepted. Because Coghlan's testimony is based on the well-established use of partition coefficients, it satisfies the *Frye* standard.

For similar reasons, Coghlan's testimony also meets the requirements of ER 702. Since his method has been demonstrated to be reliable, the remaining questions under ER 702 are whether his opinion would be helpful to the jury and whether he reliably applied his methods to the specific data at issue. Coghlan's opinion is

helpful to the jury because it estimates the historic PCB exposure at SVEC, which is necessary to prove causation of Erickson's injury.

Pharmacia raises several arguments about why Coghlan's method is not reliable or reliably applied, but these arguments properly go to the weight of his testimony, not its admissibility. Pharmacia points to the Guo study's cautionary statement that "care should be taken when applying the test results to seemingly similar materials in real-world situations." SR at 4736-37. However, Coghlan acknowledges the assumptions underlying his methods, including that all PCBs in the carpet samples were absorbed from the air, despite the presence of other potential sources at SVEC. To address this, he excluded from his calculations one carpet sample that had clear evidence of direct exposure to ballast oil and noted that the high PCB concentrations of two other samples may reflect tracking of PCBs on to the carpet (e.g., from people's shoes) rather than only absorption from the air.

Pharmacia also argues that the reliability of the carpet samples is compromised because they were collected by Dr. Yost, stored in her basement for two years, and later transferred to Coghlan for testing, raising concerns about the possibility of cross contamination. However, Coghlan acknowledged this possibility and accounted for it by testing the storage containers for any signs of cross contamination. He also noted that Dr. Yost stored each sample in a separate plastic bag, double bagged inside paper bags, which enhanced their integrity.

Pharmacia further challenges Coghlan's assumption that the PCB concentration in the Guo study's carpet samples had reached equilibrium with the concentration in the air, even though the experiment ran for only 240 hours. But Coghlan acknowledges that had the carpet samples been allowed to reach equilibrium, the partition coefficients, and thus his estimated air concentrations, likely would have been higher. In fact, the Guo study conducted a separate experiment where samples were exposed for 507 hours, resulting in PCB concentrations in one of the two carpet samples that were roughly double those observed at 240 hours.

Lastly, Coghlan's method assumes that the carpet at SVEC has similar absorbent qualities to one of the carpet samples used in the Guo study. Testimony from other industrial hygienists confirms that this is a necessary assumption in any exposure reconstruction. As Dr. Gunnarsen, the professor who testified in *Rose*, explained, his first step in any exposure reconstruction would be to consult relevant literature for a "reasonable partition coefficient" of a comparable material. *Id.* at 4232. Coghlan reasonably assumed that the carpet at SVEC was at least as absorbent as the least absorbent carpet sample in the Guo study and no more absorbent than the most absorbent carpet sample. Moreover, he presented his estimates as a range of possible air concentrations in SVEC, rather than testifying to a level of scientific certainty beyond what his method allowed.

We conclude that the identified criticisms of Coghlan's testimony go to its weight and not its admissibility, and that the trial court did not err in finding that Coghlan reliably applied his method, satisfying ER 702.

C. Coghlan's estimation using protection factors from the Thomas study satisfies *Frye* and ER 702

For this back-calculation method, Coghlan relied on another EPA study, known as the Thomas study, that measured the air concentrations of PCBs in six New York City schools both before and after remediation efforts to reduce PCB exposure. All of the schools were built between 1950 and 1978, a period when the use of PCB-containing caulk and light ballasts was common. Coghlan calculated the percentage by which remediation reduced PCB air concentrations—known as the protection factor—by dividing the postremediation concentration for each school by its preremediation concentration. He then divided the postremediation air concentrations measured at SVEC by this protection factor to estimate the preremediation air concentrations at SVEC.

All of the industrial hygienists who testified at the *Frye* hearing in *Rose*, including Pharmacia's witness, acknowledged that the use of protection factors derived from remediation efforts is a generally accepted method of both exposure reconstruction and predicting the effectiveness of future remediation. Dr. Price testified that he was not "aware of any industrial hygienists who have disagreement

on the concept of adjusting postremediation levels to estimate preremediation levels of an airborne contaminant using another site." *Id.* at 4252. Dr. Altemose testified that he uses protection factors "a couple of times a month" to predict the effect of remediation techniques and that he uses them "to reconstruct exposure" after a "remedial effort has been made." *Id.* at 4256. Further, Pharmacia's witness Dr. Moore testified that using postremediation levels to estimate preremediation levels "can be done, but in order to use one site as another site, you need to characterize that those sites are equivalent." *Id*. at 4334. The American Industrial Hygiene Association also endorses the use of protection factors in exposure reconstruction, and the Occupational Health and Safety Administration uses them to predict the effectiveness of remediation techniques. *See id*. at 6805; 8765.

While Pharmacia elicited some testimony critical of this method and Coghlan's use of protection factors, none came from an industrial hygienist. Unlike the method using carpet samples, which draws on broader principles like source-sink dynamics shared with other disciplines like environmental engineering, the use of protection factors fits squarely in the field of industrial hygiene, so testimony from experts in other fields is not relevant. For example, Dr. Herman declined to answer whether the use of protection factors is generally accepted in the field of industrial hygiene because he is "not an industrial hygienist so [he] can't speak to that." *Id*. at 4372.

Pharmacia argues that Coghlan did not demonstrate general acceptance of the use of protection factors from schools (or specifically from the Thomas study) to estimate preremediation air concentrations of PCBs. These arguments frame the analysis of general acceptance too narrowly and echo Pharmacia's criticisms of the back-calculation method based on carpet samples, overlooking that *Frye* does not require acceptance of "each discrete and ever more specific part of an expert opinion." *Anderson*, 172 Wn.2d at 611. We conclude that Coghlan's use of protection factors to estimate preremediation concentrations of PCBs is generally accepted within the relevant field of industrial hygiene.

This method of back-calculation based on the Thomas study also satisfies ER 702, as the trial court here and in *Rose* concluded. As with the method based on carpet samples, it is helpful to the jury because it estimates PCBs air concentrations for which no direct measurement exists. Pharmacia's arguments all go to the weight of Coghlan's testimony, not its admissibility.

Pharmacia primarily argues that Coghlan did not sufficiently show that the New York schools were similar to SVEC. But Pharmacia appears to require a level of identicalness that industrial hygienists would not require in order to consider the method reliably applied. Its witness John Woodyard—whose experience "'loosely'" fits in the field of "'environmental engineering'" and whom the *Rose* court found too biased to be credible, *Rose* Order at 15—testified that one would first need to

70

make sure variables such as the size of the classrooms and ventilation systems are "identical between schools" in order to use this method. SR at 4356. Dr. Herman, an environmental engineer and geologist, also testified in *Rose* that one would need to confirm that the sequence of remediation techniques used at both schools were similar, but when asked to explain what effect that would have on the air concentrations after the full remediation process was complete, he could not point to any specific effect.

In this case, Coghlan testified that the factors relevant to exposure reconstruction—the PCB sources used in the schools and the remediation techniques used to remove those sources—were similar. Additionally, as he did with the method based on carpet samples, Coghlan ran his calculations using the two schools in the Thomas study with the highest and lowest protection factors to produce a range of possible preremediation air concentrations at SVEC. His testimony supports a fair inference that SVEC shares a general similarity with other public schools built during the era of widespread PCB use, and that the remediation efforts at SVEC were at least as effective as the least effective remediation in the New York schools but no more effective than the most effective remediation. For these reasons, we conclude that the trial court reasonably concluded that Coghlan demonstrated sufficient similarity between the schools to show that he reliably applied this method of estimation using protection factors. We reverse the Court of Appeals and hold

that the trial court did not err in admitting Coghlan's testimony based on both back-calculation methods.

## CONCLUSION

This case presents important questions involving both Washington's choice of law analysis and the framework for evaluating the admissibility of expert testimony. We conclude that the trial court properly applied Washington's choice of law principles and properly admitted expert testimony.

When a party raises an actual conflict of substantive law, Washington courts apply the law of the state with the most significant relationship to that particular issue. Under this test, Missouri law applies to govern the issues of repose and punitive damages. With respect to punitive damages under Missouri law, it is not necessary to consider whether Missouri would recognize a claim for postsale failure to warn. This is because the jury's finding of liability under Washington substantive product law is sufficient to sustain a punitive damages award where the jury finds that Missouri's heightened standard of wrongful conduct is met.

Under Washington standards governing the admissibility of expert testimony, the trial court properly applied both *Frye* and ER 702 and held that Coghlan's testimony was admissible.

Accordingly, we reverse the Court of Appeals in part and hold that a new trial is not warranted. We reinstate the jury's verdict and remand to the trial court for any further proceedings consistent with this opinion.

_____
Stephens, C.J.

WE CONCUR:

_____                _____
                                                Yu, J.

_____                _____
                                                Montoya-Lewis, J.

_____                _____
Gonzáles, J.                                    Whitener, J.

_____                _____
                                                Mungia, J.

73

No. 103135-1

GORDON McCLOUD, J. (dissenting)—Washington's substantive law—the
Washington product liability act (WPLA), ch. 7.72 RCW—applies to the products
liability claims in this case. The parties agree on this point. Pet. for Rev. at 8-9;
Answer to Pet. for Rev. at 14. The majority does too. Majority at 51.

The WPLA contains an explicit statute of repose. RCW 7.72.060. As the
Court of Appeals explained, statutes of repose are part of the substantive law: they
define whether a claim ever arises in the first place. *Erickson v. Pharmacia, LLC*,
31 Wn. App. 2d 100, 119, 548 P.3d 226 (2024) (citing *Rice v. Dow Chem. Co.*, 124
Wn.2d 205, 212, 875 P.2d 1213 (1994)); *accord Goad v. Celotex Corp.*, 831 F.2d
508, 511 (4th Cir. 1987) ("Statutes of repose make the filing of suit within a
specified time a substantive part of plaintiff's cause of action." (citing *Bolick v.
Am. Barmag Corp.*, 306 N.C. 364, 293 S.E. 2d 415 (1982))). Thus, "[f]or a WPLA
claim to exist, the plaintiff must satisfy the statute's integrated statute of repose."
*Erickson*, 31 Wn. App. 2d at 125.

The WPLA's statute of repose bars claims after the expiration of the
product's useful safe life, presumptively set at 12 years. RCW 7.72.060. That's

1

what the plain language of the statute says.[1] Under applicable rules of statutory

interpretation, that's what the Washington Legislature intended. *Dep't of Ecology*

*v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (courts must

give effect to a statute's plain meaning as an expression of legislative intent if the

statute's meaning is plain on its face).

I therefore disagree with the majority's decision to say that the WPLA

provides the substantive law on liability in this case but then discard the WPLA's

explicit, claim-defining statute of repose and choose Missouri's lack of a statute of

repose instead.

As the Court of Appeals correctly explained, the statute's plain language

shows that the legislature intended the statute of repose to apply to the full chapter

---

[1] (1) Useful safe life. (a) . . . [A] product seller shall not be subject to liability to a claimant for harm under this chapter if the product seller proves by a preponderance of the evidence that the harm was caused after the product's "useful safe life" had expired.

"Useful safe life" begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner. . . .

. . . .

(2) Presumption regarding useful safe life. If the harm was caused more than twelve years after the time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by a preponderance of the evidence.

RCW 7.72.060.

in which it appears as an integral part of a WPLA claim. *Erickson*, 31 Wn. App. 2d

at 121-22 & n.10. As with all statutes of repose, the WPLA's statute of repose

reflects careful legislative balancing of competing policy concerns. *Id.* at 121-22

(citing *Bennett v. United States*, 2 Wn.3d 430, 454, 539 P.3d 361 (2023)). When

crafting the WPLA, the legislature was concerned with two important policies:

"'protecting Washington industries from excessive litigation, and preserving the

right of consumers to seek redress for injuries caused by unsafe products.'" *Id.* at

122 (quoting *Zenaida-Garcia v. Recovery Sys. Tech., Inc.*, 128 Wn. App. 256, 264,

115 P.3d 1017 (2005)). The legislature balanced these interests in the statute of

repose, which cuts off liability after a product's "useful safe life," thereby

protecting manufacturers and sellers from indefinite exposure. By creating a

rebuttable presumption that a product's useful safe life expires after 12 years, the

WPLA reflects a deliberate balance between allowing injured parties a fair

opportunity to bring claims and ensuring predictability and finality for product

sellers. *Id*. If the harm was caused after the useful safe life expired, then the

plaintiff has no WPLA claim. Thus, the statute of repose is "integrated" into the

WPLA "such that it is fundamental to the existence of a claim." *Id.* at 123.

The majority, however, bases its decision on the assumption that the

WPLA's statute of repose is not fundamental to the existence of a WPLA claim

and does not represent a legislative directive about choice of law at all. The

majority therefore discards the WPLA's explicit statute of repose in favor of

Missouri law, which contains no statute of repose at all for product liability claims.

Majority at 28.

The majority first acknowledges that the laws of Washington and Missouri

conflict on this point. *Id.* at 27. I agree. Under *Restatement (Second) of Conflict of

Laws* (Am. L. Inst. 1971), once a conflict is identified, the court must follow any

explicit or implicit statutory directive on choice of law. *Id.* at 13.[2] I agree with this,

also. But the majority then asserts that the WPLA's language provides "no

evidence" that the legislature "intended to provide courts with a directive on choice

of law" for repose. *Id.* at 29. Thus, it concludes that following *Johnson v. Spider

Staging*'s[3] issue-by-issue approach to choice of law and then applying Missouri's

law on repose does not conflict with the WPLA's statutory language. *Id.* at 31.

I respectfully disagree with those latter points (that there's no evidence the

legislature intended the WPLA statute of repose to prevail on choice of law and

---

[2] I also note that under *Restatement (Second)*, "'[p]rovided it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.'" *Erickson*, 31 Wn. App. 2d at 122 n.10 (alteration in original) (quoting RESTATEMENT (SECOND) § 6 cmt. b).

[3] 87 Wn.2d 577, 580, 555 P.2d 997 (1976).

hence that choosing Missouri law does not conflict with the WPLA's clear statute of repose language). As to the first point, there is a wealth of evidence that the legislature "intended to provide courts with a directive on choice of law" for repose for WPLA claims. *Id.* at 29. The Court of Appeals correctly explained that the language of the WPLA statute of repose shows legislative intent to make "the statute of repose mandatory to the existence of a WPLA claim." *Erickson*, 31 Wn. App. 2d at 123. That makes the WPLA's statute of repose a legislative directive—courts must apply the WPLA statute of repose to determine whether a WPLA claim exists. As to the second point, given that clear statutory language, the majority errs in concluding that applying Missouri's law on repose does not conflict with the WPLA's statutory language. Majority at 31. Actually, the WPLA's statutory language shows that Missouri's total lack of a statute of repose for product liability claims conflicts directly with the WPLA.

The majority defends its conclusion on these points by relying extensively on a Court of Appeals opinion, *Zenaida-Garcia*. Majority at 40-41 (citing *Zenaida-Garcia*, 128 Wn. App. at 266). But that case is not controlling, and, as the Court of Appeals here pointed out, it is not clear that the WPLA provided the substantive law on liability in that case at all. *Erickson*, 31 Wn. App. 2d at 121 n.9.

5

The majority also relies on this court's decision in *Rice* for that analysis and conclusion. Majority at 17 (citing *Rice*, 124 Wn.2d at 207). But that reliance is unjustified for the same reason: in *Rice*, it was also unclear whether the WPLA applied, and the parties had not briefed it; this court ultimately determined that Oregon law on liability applied and that the claim was barred by the Oregon statute of repose. *Erickson*, 31 Wn. App. 2d at 121 n.9 (citing *Rice*, 124 Wn.2d at 217).

Thus, the courts in *Zenaida-Garcia* and *Rice* "were not asked to consider the specific question we are faced with here: whether the court should apply a separate choice-of-law analysis to the statute of repose in WPLA from the choice of law governing the substantive product liability claim." *Id*. at 119. I agree with the Court of Appeals; I am not convinced that in a case like this one where "there is no dispute as to which substantive product liability law applies, any other state's statute of repose could supplant the claim-defining statute of repose in WPLA." *Id*. at 121.

To be sure, the majority's application of the "most significant relationship test" certainly finds support in our early decision in *Johnson*. 87 Wn.2d at 583-84 (applying the "most significant relationship" test to determine whether to apply Washington or Kansas law on damages in a wrongful death action). But I disagree that the majority should have reached that test at all as to the issue of repose—

6

because the plain language of the WPLA makes clear that the WPLA's statute of repose inheres in all WPLA claims, so we must apply the WPLA statute of repose, not some other state's law on repose (or lack thereof). The majority's contrary decision conflicts with our basic rule of statutory construction, that is, to determine the intent of the legislature first and foremost from the *language* that it used. *Campbell & Gwinn*, 146 Wn.2d at 9-10.

By straying from the WPLA's plain language and clear legislative intent, the majority is left with the task of balancing competing policy preferences.

But courts are not supposed to start their analysis with policy preferences when there's a state statute right on point. And there's no denying that the WPLA's explicit, detailed, and somewhat unique statute of repose is the statute right on point. It uses broad language to refer to the beneficiaries of the statute of repose: "*a product seller shall not be subject to liability to a claimant for harm under this chapter.*" RCW 7.72.060 (emphasis added). This broad language suggests that the statute of repose "applies to *every* product seller and to every claim brought under the WPLA." Majority at 30 (emphasis added) (citing Appellant Pharmacia LLC's Reply Br. at 12, 19, *Erickson v. Pharmacia LLC* (Wash. Ct. App No. 83287-5-I (2022))); *accord Erickson*, 31 Wn. App. 2d at 123. The fact that the WPLA statute

of repose appears right in the WPLA (as opposed to appearing in some other more general section) provides only further support for that point in this case.

I do not dispute the majority's explanation that "[s]cholars" have coined a fancy word to promote the process sometimes, but not always, of taking one element from one state's definition of a claim, taking another element from another state's definition of a claim, and calling it statutory interpretation. Majority at 20.

But we're not dealing with a law review article here. We're dealing with difficult legislative judgments, by legislators with perhaps differing policy priorities, expressed in statutes written by perhaps imperfect human beings. And we're trying to apply those legislative decisions to a terrible mass tort for which a variety of actors likely bear blame. I don't think that the language that the Washington Legislature chose to put into the WPLA on repose can support the majority's decision, despite the fancy word that might support such picking and choosing elements from different states' laws in other situations.

And to be fair to the scholars who coined that term, they did not mean to apply it in every situation. The majority acknowledges this. It appropriately recognizes that "dépeçage is inappropriate 'when used to fragment issues related to a common purpose or to legitimize a smorgasbord approach which inures only to

8

the benefit of the party picking and choosing.'" Majority at 21-22 (quoting

*Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059, 1064 (10th Cir. 1992)).

But the majority did not actually apply this limitation. I would. I would

affirm the Court of Appeals decision that the WPLA itself defines the claim and

defines the statute of repose. I would also affirm the Court of Appeals decision that

that statute of repose survives constitutional scrutiny (for the reasons that the Court

of Appeals states). And I would remand to the trial court for further proceedings,

just as the Court of Appeals did.

I therefore respectfully dissent.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Madsen, J.